**CANCER RESEARCH INSTITUTE, INC., Plaintiff,**

v.

**CANCER RESEARCH SOCIETY, INC., Defendant.**

**No. 87 Civ. 6831 (JFK).**

United States District Court, S.D. New York.

April 19, 1988.

Patterson, Belknap, Webb & Tyler, New York City, for plaintiff; Thomas C. Morrison, Christine H. Miller, Robert Orlin, of counsel.

**1052**

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant; Miriam Siroky, Susan R. Reiss, Kathryn L. Barrett, of counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEENAN, District Judge:

### Background

This is an action alleging false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), infringement of plaintiff's tradename, unfair competition and dilution. Plaintiff originally sought a preliminary injunction under Federal Rule of Civil Procedure ("Fed.R.Civ. P.") 65, as well as a permanent injunction and other relief. The parties agreed to a consolidation of the hearing on the preliminary injunction with a trial on the merits as provided by Fed.R.Civ.P. 65(a)(2) and the Court heard the matter, without a jury, for four days in November and December, 1987.

Plaintiff, Cancer Research Institute ("CRI"), is a fund raising organization devoted primarily to funding research in the area of cancer immunology. Through fund raising efforts and national advertisements plaintiff has raised millions of dollars in contributions for cancer research. Under advice from a Scientific Advisory Council of distinguished immunologists, these funds are channeled throughout the world to medical researchers. (Testimony of James Siegel ("Siegel") pp. 31–34).

Defendant is a California corporation originally incorporated in 1973 under the name United Cancer Research Society, Inc. ("Society"). This name was originally not challenged. Defendant dropped the word "United" from its name and began to advertise and publicize itself as Cancer Research Society. It was defendant's use of this name which gave rise to the lawsuit.

Plaintiff contends in paragraph 21 of the Complaint herein that:

The names Cancer Research Institute and Cancer Research Society are virtually indistinguishable. Defendant's use of the name Cancer Research Society in connection with an organization that solicits funds for cancer research has caused and will continue to cause confusion among potential donors to Cancer Research Institute. Confusion among professionals in the field of cancer research is also likely.

Defendant responds that plaintiff's unregistered trademark is generic and not entitled to protection. Defendant further asserts that there is no likelihood of confusion and plaintiff's mark is weak.

### Findings of Fact

Society's principal means of soliciting donations is through listing its name in phone directories across the United States. Prior to 1982, defendant generally listed its name in telephone directories under its corporate name—"United Cancer Research Society, Inc.". Thereafter, defendant gradually began to list its name in telephone directories throughout the United States as "Cancer Research Society." Defendant is and has been listing its name in many of the same directories as plaintiff. Due to the similarity between the names Cancer Research Institute and Cancer Research Society, defendant's name appears immediately after plaintiff's in approximately 50 telephone directories across the country.

In August 1987, after formally reincorporating in California under the name Cancer Research Society on July 3, 1987 (PX 8), the defendant began to list itself in the Manhattan telephone directory, directly under the plaintiff's name. Those listings are as follows:[1]

```
CANCER RESEARCH
 INSTITUTE—
National Headquarters
 133 E 58 ....................688-7515
Memorial Donations & Bequests—
 133 E 58 ....................688-7515
 Or Call
 Toll Free—Dial "1" & Then ......800 522-5022
Research and Medical Information
 1225 Park Av ..................722-8547
```

---

1. The Manhattan listings were described by witnesses at trial as "Super Bowl" listings. The typed reproduction in the main body of the text supplies the reader a fairly accurate picture of the type sizes in the telephone directories.

CANCER RESEARCH
SOCIETY—
MEMORIAL
DONATIONS &
SPECIAL GIFTS
Toll Free—Dial "1" & Then ...... 800 222-1533

Defendant was founded in 1973 by Ms. Lela Nagle (Nagle Dep. p. 7), (Sturgeon Tr. p. 267), who served as an officer for many years and remains the office manager. Ms. Nagle has no college degree and no medical or scientific training. Indeed, no one associated with defendant's organization has any training or experience in science or medicine. Defendant's highest paid employee is Kip Sturgeon (Tr. p. 272), a 23 year old college student and Ms. Nagle's son. Mr. Sturgeon is paid $36,000 per year out of funds collected by the Society.

According to Ms. Nagle's deposition testimony, Cancer Research Society generates income through the operation of a thrift shop and through the solicitation of donations. Its primary source of income is donations, most of which are generated by defendant's listing in the telephone directories. (Nagle Dep. pp. 48–50).

The testimony at trial and Plaintiff's Exhibits ("PX") disclosed the following financial information from Society's tax returns:

| | Total Revenue | Spent on Cancer Research or Cancer Patients |
|---|---|---|
| 1973 (PX 40) | $ 500 | 0 |
| 1974 (PX 41) | $ 1,045 | 0 |
| 1975 (PX 42) | $ 4,352 | 0 |
| 1976 (PX 43) | $ 5,839 | 0 |
| 1977 (PX 44) | $ 6,578 | $ 600 |
| 1978 (PX 45) | $ 5,637 | 0 |
| 1979 (PX 46) | $10,289 | $ 1,000 |
| 1980 (PX 47) | $10,113 | $ 3,000 |
| 1981 (PX 48) | No Information Available | |
| 1982 (PX 49) | $49,656 | $ 2,492[2] |
| 1983 (PX 50) | $37,868 | 0 |
| 1984 (PX 51) | $28,499 | 0 |
| 1985 (PX 52) | $65,546 | $14,039 |
| 1986 (PX 53) | $88,926 | $83,878[3] |

As of the end of November, 1987 defendant had received $270,000 in contributions and projected $300,000 for the calendar year 1987 (Tr. p. 451). Defendant does not keep records of its donors.

Kip Sturgeon testified that 50%–60% of defendant's contributions come from California with most of the remaining 40%–50% of contributions coming from Arizona, Texas and Florida (Tr. p. 283) and only about 1% from New York (Tr. p. 280). Regardless of this litigation, defendant is going to remove its listing from "the New York State phone books" because "it is not cost effective." (Tr. p. 280).

Primarily, defendant has operated out of Ms. Nagel's house which is at 13043 Burns Lane in Redlands, California (Tr. pp. 325, 341), except for a short time in early 1987 when it was headquartered in San Bernadino, California (Tr. pp. 326, 346). Defendant also receives mail and in that sense operates out of a telephone answering service at 411 Cajon Street in Redlands (Tr. p. 341) which is defendant's mailing address; defendant has also used Post Office Box 217 in Redlands as a mailing address.

Plaintiff was founded in 1953, under the name New York Cancer Research Institute, Inc. (Tr. pp. 24, 25). Its goal is to promote research in alternative methods of cancer treatment, primarily through the body's immune system. As plaintiff grew, its solicitation and funding activities became national in scope. In 1973 plaintiff changed its name from New York Cancer Research Institute to Cancer Research Institute, Inc. to reflect its national character (Tr. p. 26). Plaintiff has used the name Cancer Research Institute since then. It has a prestigious 42 member Board of Trustees, including the President of Chemical Bank, the Chief Executive of a division of Citicorp, a former Board Chairman of 20th Century Fox and Columbia Pictures. Among its Honorary Trustees are a United States Senator and a member of the House of Representatives. (PX 1).

**2.** In 1982, one Emanuel James Smith, whom Mr. Sturgeon described as "just a friend" of the defendant, bequeathed $80,000 to defendant which was assigned to the Loma Linda University in California for Cancer Research. This $80,000 was not reported on any tax form or filing (Tr. p. 422–427).

**3.** Frankly, the Court does not accept the 1986 figure for the amounts spent on services rendered by the defendant. Page 2 of the Tax Return for this year is confusing, and the Court views the figures as being overstated.

According to an audit by Deloitte, Haskins and Sells, plaintiff's total contributions in its Fiscal Year Ending June 30, 1987 were over $2.3 million and its revenue was over $3.5 million. It provided nearly $2.7 million for cancer research and clinics. (PX 3). Since 1982, CRI has received more than $13 million in donations and has provided over $10 million in funds for cancer research. Plaintiff also has a Scientific Advisory Council comprised of 42 scientists, 4 of whom are Nobel Prize winners and 14 of whom are members of The National Academy of Sciences. (PX 2—Tr. pp. 29, 30). CRI has received approximately 900 grant applications from all over the world within the last 5 years and more of them come from California than any other state. (Tr. p. 33). Between 10%–15% of the applicants actually receive grants from plaintiff and among them, from M.I.T., was Dr. Susumee Tonegawa, who won the Nobel Prize in medicine in 1987. (Tr. pp. 36, 37—PX 35). Plaintiff engages in print advertising. During 1986 and 1987, its ads appeared in 25 print publications, without charge, including such major newspapers and magazines as *The Wall Street Journal, Family Circle, Forbes, Fortune, Newsweek, Redbook, Sports Illustrated,* and *U.S. News and World Report.* The advertising space was donated by the publishers at considerable cost. (Tr. pp. 59, 60).

In 1985, a television commercial about plaintiff entitled "Combination" was created, without charge, by an advertising agency. The commercial was played at trial. All three major television networks as well as numerous local and cable stations, including WABC, WNBC, WCBS, USA Cable, MTV and WTBS Cable, have aired this commercial as a public service on a regular basis. CBS featured the commercial 123 times during 1986. The total value of the air time that has been donated to the Institute by these television stations is well above $1 million. (Tr. pp. 49–56).

One of CRI's most successful fund raising techniques is to place its name in telephone directories. By 1982, the Institute's name appeared in 120–125 directories. (Tr. p. 62). Since 1985, the Institute has been listed in approximately 415 directories. (Tr. p. 61). It spends between $60,000 and $65,000 annually for these listings. (Tr. p. 65).

Plaintiff's exhibit 29 demonstrates that in phone directories in Manhattan, the greater Los Angeles area, Tucson, Arizona, and Citrus County, Florida, defendant's ad appears right under plaintiff's ad and that in these non-New York directories, defendant's print size is at least two or three times larger than that of plaintiff.

Plaintiff's exhibits 60–75 demonstrate that plaintiff has received several letters and checks that were addressed to Cancer Research Society but which were mailed to Cancer Research Institute's offices in either New York or Los Angeles. Plaintiff's exhibit 29 shows that plaintiff has a Los Angeles address, an area from which defendant receives much of its funding. According to the credible testimony of James Seigel, the impressive executive director of CRI, plaintiff first learned of defendant's organization in March, 1987 when a California honorary trustee of plaintiff told Seigel of the Los Angeles phone listing of the Society. Seigel then checked other phone directory listings and found 30 to 40 directories across the country where CRI and defendant were both listed. (Tr. p. 85).

In plaintiff's fiscal year ending June 30, 1987, their total contributions through telephone listings were $15,000 less than in fiscal 1986. (Tr. p. 120). This decline developed over the last 5 months of fiscal 1987 and continued into the first four months of fiscal 1988 when telephone directory contributions were down from $162,000 to $134,000. (Tr. p. 121).

The Court finds as a factual matter that the explanation for the increase in contributions to the defendant, and decrease to the plaintiff, is defendant's use of the name Cancer Research Society and its extensive listing of that name in telephone books next to the listing for Cancer Research Institute in 1987 telephone directories.[4]

---

**4.** On April 4, 5 and 12, 1988, just as the Court was finishing this decision, the Court received

### Conclusions of Law

 First, in determining whether a tradename may be protected, the Court must consider the classification into which the name fits. Generic names use common words that are synonymous with the nature of the organization and are not entitled to protection. If a descriptive term acquires customer recognition and secondary meaning, it is protectible under section 43(a) of the Lanham Act even if not registered. *See Centaur Communications, Limited v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987); *American Diabetes Association v. National Diabetes Association,* 533 F.Supp. 16, 19 (E.D. Pa.1981), *aff'd mem.,* 681 F.2d 804 (3d Cir. 1982). The district court held in *American Diabetes,*

> A merely descriptive term specifically describes a characteristic of the service. It can, by acquiring customer recognition and secondary meaning, achieve protectible status as a valid trademark.

533 F.Supp. at 19.

 Plaintiff argues that the name Cancer Research Institute is at least "descriptive" and arguably "suggestive" of a charitable organization that raises funds for promotion of cancer research. Defendant argues that plaintiff's name is generic, but nothing about the name Cancer Research Institute directly suggests that plaintiff raises funds for cancer research—as opposed to actually performing cancer research. Plaintiff's name does not convey the nature of its principal activity which is fund raising and donating, and is not generic. However, the Court agrees with Judge Owen that the categories generic, descriptive, suggestive and arbitrary or fanciful "and the legal principles which they embody have 'become lost in a welter of adjectives.'" *Parrot Jungle, Inc. v. Parrot Jungle, Inc.,* 512 F.Supp. 266, 268 (S.D.N.Y.1981) (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976)).

Plaintiff's name conveys an immediate idea of the service it ultimately seeks to have rendered, i.e., research in the area of cancer, but it does not tell us what its main activity is, i.e., fund raising. The Court concludes that plaintiff's name is descriptive.

Both sides agree that a descriptive mark is not protectible absent proof of secondary meaning. *See Thompson Medical Company, Inc. v. Pfizer Inc.,* 753 F.2d 208, 212–13, 216 (2d Cir.1985) ("[d]escriptive marks ... are protectible only where secondary meaning can be established.... If an unregistered mark is deemed descriptive, proof of secondary meaning is required for the mark to be protectible."); *Edison Brothers Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1554 (S.D.N.Y.1987).

 The parties disagree as to whether plaintiff's mark has acquired secondary meaning. In this regard, the Court considers: (1) the duration of plaintiff's exclusive use of its mark; (2) the extent of its advertising and promotional efforts; (3) the extent of its fund raising; (4) the extent of charitable activities it conducted or funded; (5) the credentials of those associated with the organization; and (6) the existence of media coverage or other recognition by independent institutions. *American Diabetes,* 533 F.Supp. at 19; *Missouri Federation of the Blind v. National Federation of the Blind of Missouri, Inc.,* 505 S.W.2d 1, 7 (Mo.Ct.App.1973); *American Legal Aid, Inc. v. Legal Aid Services, Inc.,* 503 P.2d 1201, 1202–03 (Wyo.1972).

 The Court is not persuaded, as defendant urges, that the absence of a survey makes plaintiff's position untenable. Plaintiff was founded in 1953 and since 1973, it has exclusively employed the name it now uses, Cancer Research Institute. It advertises extensively in national publications and has raised over $13 million since 1982. Those associated with CRI, its Board members, advisers and grantees are recognized leaders in their fields. In addition, CRI receives free media coverage on network

---

communications from counsel about alleged phone listings by defendant and additional losses by plaintiff. The Court is not taking these letters into consideration in reaching its conclusions in this opinion.

television. In contrast, the defendant is, to be kind, an unsophisticated organization, run by amateurs who seem to the Court to be way over their respective heads. In the Court's view, the level of recognition and achievement arrived at by plaintiff entitles it to protection from later formed organizations using confusingly similar names, *see American Diabetes Assoc.*, 533 F.Supp. 16.

■ Next, the Court must address the question of whether in fact and in law the names are confusingly similar. The relevant considerations were enumerated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These *"Polaroid* factors" include:

(1) The strength of the plaintiff's name;

(2) The similarity of the names in suit;

(3) The proximity of the organizations;

(4) Evidence of actual confusion;

(5) The sophistication of potential donors;

(6) The quality of the defendant's organization; and

(7) The defendant's intent in adopting its name.

*See Polaroid*, 287 F.2d at 495.

The Court has concluded that plaintiff's mark has achieved strength and is entitled to protection.

The names of the two organizations are nearly identical. Plaintiff has supplied the names of numerous cases enjoining the use of tradenames similar in kind to those here at issue.[5] Among them are:

*American Diabetes Association v. National Diabetes Association*, 533 F.Supp. 16 (E.D.Pa.1981), *aff'd mem.*, 681 F.2d 804 (3d Cir.1982)

*American Optical Corporation v. North American Optical Corporation*, 489 F.Supp. 443 (N.D.N.Y.1979)

*Missouri Federation of the Blind v. National Federation of the Blind of Missouri, Inc.*, 505 S.W.2d 1 (Mo.Ct.App. 1973)

Regarding proximity of services, defendant argues that plaintiff devotes its funding of research to immunological cures of cancer and, therefore, no proximity of services is present. The Court views that argument as absurd.

Here, there are two organizations which rely on the use of telephone directory listings nationally to solicit funds. They have strikingly similar names and are in direct competition in identical markets. There is a strong likelihood of confusion. *American Diabetes*, 533 F.Supp. at 20; *Missouri Federation of the Blind*, 505 S.W.2d at 6. The distinction defendant seeks to draw is of no import to one who decides to donate based on telephone listings.

Even though evidence of actual confusion is not necessary to establish that two names are confusingly similar, *see Centaur Communications*, 830 F.2d at 1227, here, there is such evidence as pointed out, *supra*, p. 1054 (PX 60–75). The absence of evidence of misdirected correspondence from defendant's files is not probative. Defendant destroys records of its donations within 30 days.

Defendant argues that plaintiff's ads are directed towards a more sophisticated audience. This is clearly not so in the case of the telephone listings. In any event, cancer is of great concern to everyone. The language in *American Diabetes*, 533 F.Supp. at 21, is particularly relevant:

Persons wishing to donate are not likely to analyze in depth the credentials of the charity. Rather, they are more likely to be generally familiar with the works of a charity for a cause they support and, when solicited, will contribute to such a cause. Under these circumstances, potential contributors may easily confuse two diabetic charities that resemble one another in name and function.

Plaintiff's interest in protecting its name and reputation is an important consideration in this case. Defendant is run by persons lacking medical or scientific train-

---

5. Interestingly, although there seems to be no legal theory articulated to support the proposition, it appears that public service or benefit entities are accorded greater protection by the courts in cases like this one than are for profit business organizations.

ing. Defendant's promotional material contains erroneous statements regarding developments in cancer research. (*See e.g.,* PX 55). Plaintiff's position in the scientific community is an established and respected one (pp. 1054, 1055 *supra*). For many years, the defendant solicited money but made not even minimal contributions to cancer research.

Plaintiff is not required to prove that defendant intentionally copied its name to achieve the relief sought, *see American Optical,* 489 F.Supp. at 450. Defendant knew of plaintiff's name and organization. While the evidence does not conclusively demonstrate exactly when defendant first learned of plaintiff, defendant clearly knew of plaintiff's existence in July, 1987 when it officially reincorporated in California under the name Cancer Research Society. By then, defendant had received a protest letter from Cancer Research Institute's attorneys. (PX 37). Although plaintiff has not proven it conclusively, it is certainly conceivable that defendant saw plaintiff's listings in the southern California phone directories, changed its name and simply enlarged the type on their listing which then was directly beneath the listings for the plaintiff.

The Court has found, p. 1054, *supra,* that plaintiff did not learn of defendant's infringement until March, 1987. The evidence is that in some cases defendant still used the word United in its title as late as March, 1987. When plaintiff learned of defendant's activities, it promptly took action; plaintiff is not barred by laches. *See Parrot Jungle,* 512 F.Supp. at 270; *Cuban Cigar Brands N.V. v. Upmann International, Inc.,* 457 F.Supp. 1090, 1098–1100 (S.D.N.Y.1978), *aff'd mem.,* 607 F.2d 995 (2d Cir.1979); *D.C. Comics, Inc. v. Powers,* 465 F.Supp. 843, 849–50 (S.D.N.Y.1978).

In spite of the colloquy during oral argument on December 3, 1987, the Court sees no purpose in granting an accounting in this case. Plaintiff submitted sufficient proof of damages for the Court to make a reasonable award. Regarding plaintiff's argument concerning future bequests which may have been generated by defend-

ant's activity, the Court does not see how an accounting will resolve any such issue. At this point, we have no idea when any of these testators will pass away and it would be difficult, at best, in future years to determine why a testator chose a certain beneficiary years before during life.

Plaintiff, on the basis of the testimony in the case, is awarded damages of $38,000, together with interest and costs.

Defendant is hereby permanently enjoined from using the name Cancer Research Society or any other name confusingly similar with plaintiff's name. Defendant may not advertise in any telephone directory in the United States utilizing the name Cancer Research Society but may, if it wishes, resume using its original name United Cancer Research Society.

Judgment is entered for plaintiff.

SO ORDERED.